# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 35659

TRIAD LEASING & FINANCIAL, INC., )
)
    Plaintiff-Counterdefendant- )
    Respondent, )
)
v. )
)
ROCKY MOUNTAIN ROGUES, INC., a )
Wyoming Corporation; JAMES )
BLITTERSDORF, an individual; and )
GLENNA BLITTERSDORF- )
CHRISTOFFERSON, an individual, )
)
    Defendants-Counterclaimants-Third )
    Party Plaintiffs-Appellants. )
)
v. )
)
G. ALAN MC RAE, personally d/b/a Lund )
Machinery, and LUND MACHINERY, an )
administratively dissolved Idaho and Utah )
Corporation, )
)
    Third Party Defendants-Respondents. )

Boise, December 2009 Term

2009 Opinion No. 154

Filed: December 30, 2009

Stephen W. Kenyon, Clerk

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, in and for Ada County. The Hon. Kathryn A. Sticklen, District Judge.

The judgments of the district court are affirmed.

Swafford Law Office Chtd., Idaho Falls, for appellants. Ronald L. Swafford argued.

Ringert Clark, Chtd., Boise, for respondent Triad Leasing & Financial. S. Bryce Farris argued.

Beard St. Clair Gaffney, PA, Idaho Falls, for respondent Lund. Lance J. Schuster argued.

---

EISMANN, Chief Justice.

In this case, an equipment owner had been leasing construction equipment to one of its customers. At the suggestion of the equipment owner, the customer agreed to enter into a lease-purchase agreement if the equipment owner could find an entity that would finance the transaction. The equipment owner contacted a leasing broker, who contacted a financing entity that agreed to purchase the equipment and lease it to the customer under a lease-purchase agreement. The customer defaulted, the financing entity repossessed and sold the equipment, and it then sued the customer for the deficiency. The customer counterclaimed against the financing entity and filed a third-party claim against the original equipment owner. The customer appeals from judgments in favor of those parties. We affirm the judgments.

## I.  FACTS AND PROCEDURAL HISTORY

G. Alan McRae (Seller) was doing business in Salt Lake City, Utah, and Idaho Falls, Idaho, under the name of Lund Machinery. In 2003, he had leased a forklift to Rocky Mountain Rogues, Inc., a business located in Alpine, Wyoming, which was operated by James Blittersdorf and Glenna Blittersdorf-Christofferson (all collectively called Lessees). Lessees dealt with Keith Webb, an employee of Seller, in that transaction. During that lease, Lessees purchased a 1.5-yard bucket to use on the forklift.

In January 2006, Keith Webb approached Lessees and asked if they would be interested in converting the lease into a lease-purchase agreement. Lessees indicated they would, on the condition that they did not have to pay any money up front. Lessees had an option to purchase the forklift, and if they exercised that option a portion of the lease payments would be applied to the purchase price. Lessees contend that Webb assured them that with the "equity" they had in the forklift and by using the bucket as a down payment, Lessees would not have to pay any money up front to purchase the forklift.

Webb agreed to contact someone who could arrange the lease-purchase transaction. A short time later, Lessees received a call from Joe Leslie (Broker), an independent lease broker working for FCI Financial Services, Inc., in Denver, Colorado. Broker said he had been contacted by Webb and would send Lessees an application, and he did so. Broker worked out the terms of the lease-purchase agreement with Lessees and with Triad Leasing & Financial, Inc., (Lessor) located in Boise, Idaho, the party that would finance the transaction. In February,

2

Broker notified Lessor that Lessees also wanted to finance the purchase of a jib boom, and Lessor agreed to add it to the lease-purchase agreement.

On March 15, 2006, Bennett Coffman, an employee of Seller, arrived at Lessees' place of business with three proposed contracts: an "Equipment Lease Contract," an "Equipment Purchase Agreement," and a "Lease Addendum." (Collectively called Agreement). Prior to that date, Lessees had not had any contact with Lessor. Under the Agreement, Lessees would lease from Lessor the forklift, the bucket, and the jib boom, and at the end of the lease they would have an option to purchase that equipment for $5,000. The Agreement also provided for a $5,000 security deposit.

After Lessees signed the Agreement, Coffman requested a check. When Lessees said that it was their understanding that they would not have to pay any money up front, Coffman said he knew nothing about the transaction and would get Broker on the telephone. He did so, and Lessees talked with Broker about the requested check. After that conversation, Lessees gave Coffman a check payable to "Triad Leasing Financial" for $5,600, which represented the $5,000 security deposit, $250 for Wyoming sales tax, and $350 for a document fee. Lessees assert that after their conversation with Broker, they understood that the check would be held and not cashed.

Lessor had agreed to purchase the forklift, bucket, and jib boom from Seller in order to lease them to Lessees. Therefore, the Agreement included the following provision:

> Lessee hereby acknowledges that, although Lessee has signed the Lease Agreement on the above described Equipment, the Equipment has **not** been delivered or installed, or is being used on a test period. Lessee understands and agrees that Lessor shall have no obligation to pay for the Equipment until Lessee has "accepted" the Equipment and Lessor has accepted the Lease at their office. By signing below, Lessee specifically authorizes Lessor to accept an Oral Acceptance from Lessee. (Emphasis in original.)

On March 20, 2006, Vickie Turner, an employee of Lessor, closed the transaction. Before releasing the funds to Seller, she needed the Lessees' verbal acceptance of the leased equipment. Broker had informed her to contact him so that he could have Lessees contact her due to Lessees' busy schedule. She called Broker, and later that day Jim Blittersdorf called her and orally accepted the leased equipment. She then released $56,465.68 to Seller to purchase the leased equipment and $2,500.00 to Broker for his commission and deposited Lessees' $5,600 check.

On March 31, 2006, Lessor was notified that Lessees' check was dishonored due to insufficient funds. Lessor made several telephone calls to Blittersdorf leaving messages to call about the dishonored check, but he did not return the calls. Lessor also called Broker, who on April 5, 2006, stated that Blittersdorf claimed to have mailed Lessor a check on March 31, 2006, but that check never arrived.

By letter dated April 11, 2006, Lessor notified Lessees that it had exercised its right under the Agreement to declare all future lease payments due and demanded that Lessees pay the sum of $92,701.70 within ten days. On April 13, 2006, Blittersdorf called an employee of Lessor and stated that he was trying to get refinancing for a commercial property. Lessor's employee stated that Lessor needed a cashier's check by April 14, 2006. The employee asked Blittersdorf why this happened, and he responded that he did not know about the "upfront money" until the last minute.

Lessees did not make any payment, and Lessor hired someone to repossess the equipment. That person reported that he had to hot wire the forklift because Blittersdorf would not give him the key. The forklift and bucket were sold at a public auction on July 12, 2006. The jib boom was not repossessed, apparently because Seller had not delivered it to Lessees.

On July 26, 2006, Lessor sent Lessees a letter demanding payment of $58,754.80 within ten days, the balance owing after deducting the net proceeds from the auction. Lessees did not pay that amount, and on August 8, 2006, Lessor filed this action to recover that sum. Lessees answered and filed a counterclaim against Lessor and a third-party claim against Seller.

Seller moved for summary judgment. After argument on the motion, the district court granted the motion on November 7, 2007. The claims between Lessor and Lessees were tried to the district court, and on February 14, 2008, it entered its findings of fact and conclusions of law finding in favor of Lessor on all claims. On February 28, 2008, the court entered a judgment in favor of Lessor against Lessees which awarded Lessor damages in the sum of $72,334.40, including prejudgment interest, and dismissed Lessees' counterclaim. On March 31, 2008, the court entered a judgment in favor of Seller on all claims asserted against it by Lessees. The court later awarded Seller costs totaling $17,131.82, which included attorney fees pursuant to Idaho Code § 12-120(3). Lessees timely appealed.

## II.  ISSUES ON APPEAL

1.  Did the district court err in granting summary judgment in favor of Seller?

2.  Did the district court err in finding that Lessor had not breached the Agreement?

3.  Did the district court err in finding that Lessees had breached the Agreement?

4.  Is any party entitled to an award of attorney fees on appeal?

## III.  ANALYSIS

### A.  Did the District Court Err in Granting Summary Judgment in Favor of Seller?

In its third-party complaint, Lessees asserted claims against Seller for breach of contract, fraud, and violation of the Idaho Consumer Protection Act.  The district court granted summary judgment dismissing those claims.  Lessees contend on appeal that the district court erred in dismissing the breach of contract and fraud claims.

**1.  Breach of contract claim based upon Seller being an agent of Lessor.**  Lessees contend on appeal, "The basis for the claim of a breach of contract against Lund is founded on Lund's creation of a contract with Rocky Mountain directly and/or being an agent of Triad." With respect to the claim that Seller was an agent of Lessor, Lessees argue:  "In considering a breach of contract the District Court relied upon paragraph 4(b) of the contract wherein Triad attempts to disclaim any connection to an individual or entity as an agent.  Despite this disclaimer language, every action of Lund indicated an agency relationship."  Paragraph 4(b) of the Agreement states:

> 4. NO RIGHT TO CANCEL AND OTHER IMPORTANT TERMS OF THE LEASE.  You agree as follows:
> . . . .
> (b) *THE LESSOR IS NOT RELATED TO* MANUFACTURER(S) OR VENDOR(S); NO CLAIMS TO BE MADE AGAINST LESSOR.  *WE ARE NOT RELATED IN ANY WAY TO THE VENDOR*(S) OR MANUFACTURER(S). *NEITHER THE VENDOR*(S) *NOR ANYONE ELSE IS AN AGENT OF OURS* AND NO STATEMENT, REPRESENTATION, GUARANTEE, OR WARRANTY MADE BY THE VENDOR(S) OR OTHER PERSON(S) IS BINDING ON US OR WILL AFFECT YOUR OBLIGATIONS TO US.  . . . . (Emphasis added.)

In granting Seller's motion for summary judgment, the district court correctly ruled that there was no genuine issue of material fact on the issue of whether Seller was an agent of Lessor.

The undisputed facts showed it was not. We need not examine Lessees' arguments regarding the existence of such alleged agency, however, because Seller would not be a party to the Agreement even if it were an agent of Lessor.

"A person making a contract with another as an agent for a disclosed principal does not become a party to the contract." *General Motors Acceptance Corp. v. Turner Ins. Agency, Inc.*, 96 Idaho 691, 696-97, 535 P.2d 664, 669-70 (1975). In this case, Lessor was expressly named as a party to the contract. The Agreement states on its face that "Lessor ('Us')" is "Triad Leasing & Financial, Inc." and that "Lessee ('You')" is "Rocky Mountain Rogues, Inc."[1] The face of the contract also states that "Vendor" is "As Detailed On 'Exhibit A,' Attached," and the attached Exhibit A identifies the Vendor as "Lund Machinery Company." The Agreement also provides:

> 1. REQUEST FOR US TO ACQUIRE EQUIPMENT FOR YOU. You (the Lessee identified above) wish to acquire certain equipment from the Vendor(s) identified above. Rather than purchasing it yourself, you have come to us and asked us to purchase it and then lease it to you. In exchange for our agreement to do this, you have agreed to all of the terms in this Lease Agreement ("Lease"). . . . .

Thus, because Lessor was disclosed as the contracting party in the Agreement, Seller would not be liable on the contract even if he had been an agent of Lessor. Because Seller was not a party to the Agreement, it could not be liable for breach of the Agreement.

Lessees claim that Seller was a party to the Agreement because "[t]he contract itself states that Rocky Mountain has rights against the vendor." In making this argument, Lessees misstate the applicable provision of the Agreement.

Paragraph 3(d) of the Agreement states:

> 3. YOUR SELECTION OF THE VENDOR(S) AND THE EQUIPMENT. You hereby acknowledge and agree:
> . . . .
> (d) PRIOR TO EXECUTING THE LEASE, YOU RECEIVED AND APPROVED THE SUPPLY CONTRACT (IF ANY) BETWEEN US AND THE VENDOR(S), AND YOU HAVE BEEN ADVISED IN WRITING (OR ARE NOW ADVISED HEREBY) THAT YOU MAY HAVE RIGHTS AGAINST THE VENDOR(S) UNDER THE SUPPLY CONTRACT (IF ANY) AND THAT YOU MAY CONTACT THE VENDOR(S) FOR INFORMATION ABOUT WHAT YOUR RIGHTS AGAINST THE VENDOR(S) ARE (IF ANY).

6

This provision states that Lessees *may* have rights against Seller under the *supply contract*, if there is a supply contract, and that Lessees should contact Seller to determine what rights, if any, they may have under that contract. It does not state that Lessees have any rights against Seller under the Agreement.

Lessees also claim that "[t]he final box on the document states that there is no obligation to pay for the equipment on the lease until it has been delivered." The "final box" in the Agreement includes a provision stating, "Lessee understands and agrees that Lessor shall have no obligation to pay for the Equipment until Lessee has 'accepted' the Equipment and Lessor has accepted the Lease at their office. By signing below, Lessee specifically authorizes Lessor to accept an Oral Acceptance from Lessee." Under this provision, Lessor did not have to pay for the equipment until Lessees orally stated that they had accepted it. Although in this case it would be Seller who was obligated to deliver the equipment to Lessees, this provision does not in any way make Seller a party to the Agreement.

In granting Seller's motion for summary judgment, the district court stated, "The contract between Rocky Mountain and Triad is clear and unambiguous. Lund is not a party to it, and assumed no obligations under it." The district court did not err in holding that Seller was not a party to the Agreement.

**2. Breach of contract claim based upon a separate oral agreement with Seller.** Lessees next contend, "Even if Lund was not an agent for Triad, the District Court committed error in determining that there was no issue of material fact as to Rocky Mountain proving a claim of breach of contract against Lund." According to Lessees, "an agreement was reached between rocky [sic] Mountain and Lund **before** the Triad contract came into existence." (Emphasis in original.) This alleged oral contract was that Seller would sell to Lessees the forklift and jib boom, the bucket would be a security deposit for the sale, and Seller would service the equipment and find an entity to finance Lessees' purchase. Lessees assert that Seller performed this oral contract "by taking the equipment back and servicing it for the purchase" and that Lessees performed the contract "by providing financial information to process the purchase." Lessees do not explain why they would contract to lease the forklift and jib boom

---

[1] Glenna Blittersdorf-Christofferson and James Blittersdorf signed as guarantors.

from Lessor if they already had entered into a binding contract to purchase those same items from Seller.

Lessees argue that the district court failed to address this oral contract in granting Seller's motion for summary judgment. The court undoubtedly did not do so because Lessees did not allege it as one of their claims against Seller.

In their answer, Lessees admitted that "[o]n or about March 15, 2006, [Lessees] entered into a Lease Agreement with [Lessor] for the lease of certain equipment for business purposes" and that "[a] true and correct copy of the Lease Agreement is attached hereto [to the complaint] as Exhibit A." A copy of the Agreement was attached as Exhibit A to Lessor's complaint.

In their counterclaim against Lessor, Lessees first stated that they "hereby re-allege all admissions, denials and affirmative defenses as set forth above [in Lessees' answer to Lessor's complaint] as if set forth in full hereinafter." They then alleged that Lessor: "breached the contract by failing to deliver the jib boom to the [Lessees]"; "breached the contract by demanding payments from the [Lessees] before they were due under the terms of the contract"; "breached the contract by declaring the [Lessees] to be in default before any obligation was due"; and "breached the contract by repossessing the forklift when the [Lessees] were not in default under the terms of the contract." The references to "the contract" in the counterclaim could only mean the Agreement because that was the only contract mentioned between Lessor and Lessees.

In their third-party claim against Seller, Lessees first stated that they "restate the allegations set forth in [Lessee's counterclaim against Lessor] as if fully set forth herein." Thus, Lessees began their third-party claim by re-alleging all admissions, denials, affirmative defenses, and allegations they had made against Lessor in their answer and counterclaim. Their breach-of-contract allegations were as follows:

COUNT ONE
BREACH OF CONTRACT

54. The Defendants/Third Party Plaintiffs purchased the equipment described herein, based upon the representations of Lund/McRae; Lund/ McRae arranged for financing, and said purchase was exclusively based upon the representations and agreements made by Lund/McRae. Lund/McRae individually and in concert with the Plaintiff breached the contract by failing to deliver the jib boom to Defendants/Third Party Plaintiffs.

55. McRae/Lund individually and in concert with the Plaintiff caused breached [sic] the contract by demanding payments before they were due under the terms of the contract.

56. McRae/Lund individually and in concern [sic] with Plaintiffs caused the breach of the contract by declaring the Defendants/Third Party Plaintiffs to be in default before the obligation was due.

57. McRae/Lund caused the notification of breach of the contract and repossession of the forklift when the Defendants/Third Party Plaintiffs were not in default under the terms of the contract.

58. Because of the McRae/Lund's breaches outlined above the Defendants/Third Party Plaintiffs have suffered damages in an amount to be determined at trial including, the loss of use of the forklift, the loss of the down payment accrued through the two years of lease payments and the attorney's fees and costs accrued in the defense of this action. The third-party defendants are liable and responsible to the Defendants/Third Party Plaintiffs for any damages awarded the Plaintiff herein on their claim against the Defendants/Third Party Plaintiffs.

In their third-party claim against Seller, Lessees alleged that Seller had breached "the contract" by taking certain actions "individually and in concert with" Lessor. The actions by Seller that allegedly breached "the contract" were the same alleged actions by which Lessor breached the Agreement. Lessees alleged that Seller "individually and in concert with" Lessor: "breached the contract by failing to deliver the jib boom"; "breached the contract by demanding payments before they were due under the terms of the contract"; and "caused the breach of the contract by declaring the [Lessees] to be in default before the obligation was due." They also alleged that Seller "caused the notification of breach of the contract and repossession of the forklift when the [Lessees] were not in default under the terms of the contract." The breach-of-contract allegations in Lessees' third-party claim clearly only referred to an alleged breach of the Agreement. There is no reference to any other contract that Seller could have breached by taking actions "individually and in concert with" Lessor.

In addition, when defending against Seller's motion for summary judgment, Lessees did not argue that their third-party claim alleged that Seller had breached an oral contract. The basis of their defense to summary judgment on their breach-of-contract claim was the argument that "it's our belief that there is an agency relationship by implication between [Seller] and [Lessor]" and that "[Lessees] assumed they were one and the same entity. . . . an interrelated company."

9

Lessees third-party claim against Seller could not reasonably be construed as alleging the breach of an oral contract with Seller entered into before Lessees entered into the Agreement. The district court did not err in failing to address a claim that was not alleged.

**3.  Fraud.**  In its third-party claim against Seller, Lessees alleged that "[Seller] in conjunction with [Lessor] represented that it would need a $5,600.00 check from the [Lessees] though it was never to be negotiated (cashed) and was only required as documentation for the purchase transaction and that the inclusion of the already purchased bucket as part of the sale would serve as the security."  Lessees had made the same allegation in its counterclaim against Lessor, although they alleged that Seller made the misrepresentation "as agent and representative of" Lessor.

The $5,600 check was made payable to Lessor.  Lessees do not contend that Seller agreed to hold that check for five years until the end of the lease term.  They allege that Seller misrepresented that Lessor would hold the check and never cash it.  Relying upon *First Security Bank of Idaho, N.A. v. Gaige*, 115 Idaho 172, 175, 765 P.2d 683, 686 (1988), the district court held that Seller's alleged misrepresentation regarding Lessor not cashing the check was not sufficient to show fraud because it was a promise of a future event, not a representation of existing facts.  An action for fraud cannot be based upon a statement of a future event unless there is clear and convincing evidence that the person making the representation knew, at the time the representation was made, that the future event could not occur.  *Thomas v. Med. Ctr. Physicians, P.A.*, 138 Idaho 200, 207, 61 P.3d 557, 564 (2002).

On appeal, Lessees contend that Seller's alleged misrepresentation that Lessor would never cash the check was not a promise of future conduct.  It was a misrepresentation that the check was only a "paper trail" rather than a check for payment of the deposit and closing costs. A paper trail is "[d]ocumentary evidence of one's actions." *The American Heritage Dictionary of the English Language*, http://dictionary.reference.com/browse/paper trail.htm (accessed:  Dec. 11, 2009).  Lessees offer no explanation as to what action the check was supposed to document. Obviously, it would not document the payment of the security deposit because if the check was never to be cashed, there would be no payment of the security deposit.  The only action the check could document is that Blittersdorf had made a check dated "3-15-06" payable to "Triad Leasing Financial" in the sum of "$5,600.00."  Lessees offer no explanation as to why Seller would want to document that action when the check was never to be negotiated.

10

In their briefs on appeal, Lessees do not cite to any evidence in the record supporting their fraud allegation against Seller. During argument on the motion for summary judgment, Seller's counsel referred to two affidavits filed by Lessees in opposition to the motion for summary judgment, but those affidavits are not in the record on appeal. "Error will not be presumed on appeal but must be affirmatively shown on the record by appellant. Where an incomplete record is presented to this Court, the missing portions of that record are to be presumed to support the action of the trial court." *Rutter v. McLaughlin*, 101 Idaho 292, 293, 612 P.2d 135, 136 (1980) (citations omitted).

In their third-party claim, Lessees alleged that Seller represented that the check would not be negotiated, but they did not identify the person who allegedly made that representation on behalf of Seller. In his trial testimony, Blittersdorf testified that it was actually Broker who allegedly made that representation. According to Blittersdorf, "we never discussed giving an actual check" until Coffman asked for one on March 15, 2006, when he obtained Lessees' signatures on the Agreement. When Coffman asked for the check, Blittersdorf testified that he responded by telling Coffman "that that was not the agreement" and that Coffman then called Broker and had Blittersdorf discuss the check with him. After discussing the check with Broker, Blittersdorf testified that he gave Coffman the check for $5,600 because "I was told the check would never be cashed."[2]

---

[2] The relevant portion of Blittersdorf's trial testimony was as follows:
>    Q. [W]hat happened after you signed it [the lease-purchase agreement]?
>    A. Bennett Coffman requested a check from me.
>    Q. And had you ever had a discussion with anyone at any time prior about you giving them a check?
>    A. It was only discussed that I would never have to pay upfront money. So we never discussed giving an actual check.
>    Q. What was your reaction when you were asked for a check?
>    A. I told Mr. Coffman that that was not the agreement. And he said he would get Joe Leslie on the phone.
>         . . . .
>    Q. Did you have a discussion with Mr. Leslie about the check that was being requested?
>    A. Yes.
>    Q. And did you inform Mr. Leslie of your understanding at the time? What did you say to Mr. Leslie?
>    A. I told him that it was always agreed that there would never be any money have to be paid up front.
>    Q. And after you had that additional conversation with Mr. Leslie, did you give him a check? Did you give Mr. Coffman a check?
>    A. I did.
>    Q. For how much?

11

It is clear from Blittersdorf's testimony that any representation allegedly made that Lessor would never cash the check would have been made by Broker. Although Lessees argued in opposition to the motion for summary judgment that Blittersdorf "dealt with a guy on the phone named Joe Leslie [Broker], but he assumed that Joe Leslie was part of Triad or part of Lund," Lessees do not cite to any evidence establishing an agency relationship between Broker and either Seller or Lessor.[3] Lessees have not shown that the district court erred in granting summary judgment on their fraud claim against Seller.[4]

## B. Did the District Court Err in Finding that Lessor Had Not Breached the Agreement?

In their counterclaim against Lessor, Lessees alleged that Lessor "breached the contract by declaring the Defendants to be in default before any obligation was due." The district court found that Lessor had not breached the Agreement, and Lessees contend that such finding is erroneous for several reasons.

First, Lessees state, "The contract states that payments are not due until acceptance of the delivery of the equipment." Referring to a table on the first page of the Agreement entitled "Rental Payment Schedule," Lessees then state that "at best, a one time payment of $5,000.00 is stated to be due 'Upon Acceptance of Equipment Delivery.'" If that interpretation is correct, then the security deposit would have been due on March 20, 2006, when Blittersdorf told Turner that he accepted delivery of the equipment. However, Lessees then state, "As noted in the

---

A. For $5,600.
Q. Why wasn't it made out for 5,000, which was the amount that was listed on the document?
A. That was the amount he requested. So I believe there was --
Q. Did you know at the time why it was 5600 instead of 5-?
A. I didn't right then at the time.
Q. Did it matter to you whether it was 5600 or 5- at the time?
A. No.
Q. Why not?
A. I guess it didn't because I was told the check would never be cashed.

[3] In its findings of fact after the trial, the district court found: "Rocky Mountain asserted at trial that Leslie, the broker, also made misrepresentations as an agent of Triad. There was no evidence that Leslie was an agent of Triad . . . ."

[4] Lessees 'third-party complaint was verified. In defending the motion for summary judgment, Lessees did not mention that the third-party complaint was verified or even refer to it, nor have they argued that fact on appeal. Therefore, we will not consider it. *Esser Elec. v. Lost River Ballistics Techs., Inc.*, 145 Idaho 912, 919, 188 P.3d 854, 861 (2008).

section above, the clear language of the contract would state that the one time payment upon acceptance of equipment delivery was $.00." In their reply brief, Lessees refer to this "onetime payment of zero" as support for stating, "At the time of signing the contract, or at the time of accepting the contract, there was no payment due." Thus, they seem to argue that the Agreement only provided for one, one-time payment, and it was "$.00," not the $5,000 security deposit.

Lessees' arguments in another portion of their brief undermine this argument. The table to which Lessees refer consists of seven columns. The first column is entitled "Term (months)," and the number "60" is entered in that column. The second through fifth columns are divided into two rows. Those columns are entitled "Total # of Payments," "Amount of Each Payment," "Payment Due Dates," and "Payment Frequency." The entries in the first row state that there is "1" payment in the amount of "$.00" that is due "Upon Acceptance of Equipment Delivery," and that it is a "One Time" payment. The entries in the second row state that there are "59" payments in the amount of "$1,406.00" each that are due "Monthly Beginning: April 20, 2006" and that are to be paid "Monthly." The sixth column in the table is entitled "Interim Rent Paid," and "$.00" is entered in that column. The seventh column is entitled "Security Deposit," and "$5,000.00" is entered in that column. There is no entry in the table expressly stating when the security deposit is due.

The reference to a one-time payment of $0.00 due upon acceptance of equipment delivery is contained on the first row of the second through fifth columns. In another part of their brief, Lessees explained the problem of construing the information on that row as applying to the seventh column listing the security deposit. They wrote: "The final section [in the table] is the Security Deposit that indicates $5,000.00. *This section is not logically connected to the column to the left or any other columns.* The horizontal line is not extended through the previous column." (Emphasis added.) The "horizontal line" to which Lessees refer is the line dividing the second through fifth columns into two rows. That line does not extend to the right through the sixth column entitled "Interim Rent Paid" or the seventh column entitled "Security Deposit." It also does not extend to the left through the first column entitled "Term (months)." Thus, if as Lessees argue in the other portion of their brief, the entries stating there is a one-time payment of $0.00 due upon acceptance of equipment delivery are "not logically connected" to the column stating the security deposit, those entries could not be construed as excluding any requirement to pay the security deposit.

13

The Agreement is ambiguous as to when the security deposit was to be paid. Paragraph 7 of the Agreement indicates that the security deposit would be paid before the Agreement became effective. That paragraph states:

> 7. ADVANCE PAYMENT(S) AND/OR SECURITY DEPOSIT. *You have paid us one or more advance payments and/or a security deposit in the amount(s) indicated above. If the Lease does not commence* for reasons other than our negligence, we may retain such monies to compensate us for our credit analysis and other administrative costs. Any security deposit collected can be used at Lessor's discretion to pay any of your Obligations due on this Lease or otherwise. If any part of a security deposit remains at the end of the Term of the Lease, we will return the remainder to you, without interest, provided, however, you are not then in default under the Lease. (Emphasis added.)

There are no "advance payments" that are "indicated above" in the lease-purchase agreement, but there is a $5,000 security deposit indicated above. The above-quoted provision states that with respect to the security deposit, Lessor could retain such monies if the lease does not commence for reasons other than Lessor's negligence. Lessor would not be able to retain the security deposit if the lease does not commence only if the security deposit was paid before Lessor signed the Agreement. In addition, the conduct of the parties shows that the security deposit was due upon the signing of the Agreement.

The interpretation of an ambiguous contract is a question of fact which focuses upon the intent of the parties. *Bream v. Benscoter*, 139 Idaho 364, 367, 79 P.3d 723, 726 (2003). "A trial court's findings of fact will not be set aside on appeal unless they are clearly erroneous." *Id*. When determining the parties' intent, the court considers "the contract as a whole, the language used in the document, the circumstances under which it was made, the objective and purpose of the particular provision, and any construction placed upon it by the contracting parties as shown by their conduct or dealings." *J.R. Simplot Co. v. Bosen*, 144 Idaho 611, 614, 167 P.3d 748, 751 (2006). The district court determined that Lessees did not pay the security deposit when it was due, and Lessees have not shown that such finding was clearly erroneous.

Lessees next assert, "Again on the bottom of the contract in the last boxed section, the document states there is no obligation to pay until acceptance of the delivery." As stated above, Lessees misstate the contract language. The Agreement actually states in that box, "Lessee understands and agrees that *Lessor* shall have no obligation to pay for the Equipment until

14

Lessee has 'accepted' the Equipment . . . ." (Emphasis added.) Lessees apparently misread "Lessor" as being "Lessee."

Next, Lessees state, "The contract states that the acceptance of delivery did not occur until March 20, 2006. By claiming a breach in the contract from the March 17, 2006 payment, Triad breached the contract." Lessor's letter dated April 11, 2006, stated, "The account is presently past due for the March 17, 2006 payment." During the trial, Lessor's collection manager testified that the date was in error. It should have been March 15, 2006, representing the date of the Lessees' check. That error is meaningless. The Agreement does not require Lessor to give Lessees notice of default and an opportunity to cure. It states that a default occurs when "You, or any guarantor of this lease fail to make any rental or other payment within a period of ten (10) days after the due date." It also provides the Lessor can take action to collect "[i]n the event you default under this Lease." Thus, the notice of acceleration was valid if, on April 11, 2006, Lessees were more than ten days past due in paying the security deposit. A dishonored check is not a payment. *Western Idaho Prod. Credit Ass'n v. Simplot Feed Lots, Inc.*, 106 Idaho 260, 262, 678 P.2d 52, 54 (1984). The district court did not err in holding that Lessees were more than ten days past due in paying the security deposit by April 11, 2006.

Next, Lessees state, "The District Court also committed error in finding that the delivery of the equipment did not matter based on paragraph 8 of the contract." Paragraph 8 of the Agreement states:

> 8. EQUIPMENT DELIVERY. You understand and agree that we are not responsible for packaging, delivery, installation, or testing of the Equipment. You (and/or the Vendor(s), if you have made such arrangements with the Vendor(s)) are responsible for all such matters. You agree that you will not have any complaint against us if the Vendor(s) or any other person(s) improperly packages the Equipment or delays in delivering or installing it.

Lessees assert, "While Triad may not have been responsible for the delivery of the equipment, they cannot have an enforceable contract without the equipment being delivered." They neither cite authority nor provide argument supporting this assertion.

Lessor does not provide any equipment. It only finances lease transactions. As happened in this case, its lessees select the vendor and the equipment, and the vendors are responsible for delivering the equipment to the lessees. In this case, once Blittersdorf gave Lessor oral acceptance of delivery of the equipment, Lessor paid the vendor (Seller). At that time, Seller had

not delivered the jib boom to Lessees, but Blittersdorf was apparently willing to trust Seller to do so. If he was not, then he should not have given Lessor oral acceptance of delivery.

Next, Lessees contend that the district court erred in finding that Blittersdorf had given Turner, Lessor's employee, oral acceptance of delivery because "she testified that she had no way to ensure that the person who called her and claimed to be Mr. Blittersdorf was in fact Mr. Blittersdorf." Turner testified several times, without objection, that Blittersdorf contacted her by telephone on March 20, 2006. She stated that Broker had instructed her to contact him so he could have Blittersdorf call, due to Blittersdorf's busy schedule. When she was ready to obtain the verbal acceptance of the equipment, she called Broker, and she was later contacted by Blittersdorf. He told her about his bar and website, and she asked for the website address and looked up the website. She asked for Blittersdorf's address and the physical address of the equipment, and his answers matched the mailing address and equipment location on the Agreement. She also asked if he had the equipment, if he was ready to accept it, and if he was ready for her to release funds, and he answered "Yes" to all of those questions. On cross-examination, she admitted that it was possible that Broker's assistant could have been impersonating Blittersdorf, but she also stated that she had no reason to doubt she was talking to Blittersdorf.

Blittersdorf testified during that trial that he was positive he had never called Lessor and that he did not call Lessor and confirm that he had all of the equipment. However, he was impeached with his pretrial deposition testimony in which he stated several times that he did not know whether he had talked to anyone from Lessor about accepting delivery of the equipment.

"A trial court's findings of fact will not be set aside on appeal unless they are clearly erroneous. When deciding whether findings of fact are clearly erroneous, this Court does not substitute its view of the facts for that of the trial court." *Thomas v. Madsen*, 142 Idaho 635, 637, 132 P.3d 392, 394 (2006). "It is the province of the trial court to determine the credibility of witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence." *KMST, LLC v. County of Ada*, 138 Idaho 577, 581, 67 P.3d 56, 60 (2003). The district court found that Turner's testimony was more credible than Blittersdorf's. The court's finding that he orally accepted delivery of the equipment is not clearly erroneous.

**C. Did the District Court Err in Finding that Lessees Had Breached the Agreement?**

The district court found that Lessees had breached the Agreement by failing to pay the $5,000 deposit when due. Lessees make several arguments in challenging that finding, each of which will be discussed below.

**1. Finding that the Agreement was clear and unambiguous.** In granting Seller's motion for summary judgment, the district court wrote: "The contract between Rocky Mountain and Triad is clear and unambiguous. Lund is not a party to it, and assumed no obligations under it." Lessees argue that this was error because "there are numerous inconsistencies and ambiguities in the contract that require additional information to ascertain the meaning of the provisions and the intent of the parties." The asserted inconsistencies or ambiguities are: (a) the Agreement has an inconsistency because it gives Lessees' address as the "Equipment Location," but also provides that Lessees must accept the equipment, indicating it has not yet been delivered; (b) the Agreement is ambiguous as to when the $5,000 security deposit was to be paid; and (c) various provisions of the Agreement, when taken together, create an inconsistency and ambiguity because "the contract cannot be completed and enforced until delivery of the equipment is completed but even if there is no delivery, it is not Triad's responsibility so there is no possible claim against them." According to Lessees, "The inconsistencies require outside information and corroboration to ascertain their meaning and reconcile the differences."

When read in context, the district court's finding that the Agreement was "clear and unambiguous" was in connection with the fact that Seller was not a party to the contract. The Agreement was clear and unambiguous with respect to that issue. The court did not state that every single provision in the contract was clear and unambiguous. If Lessees contended that any relevant provisions in the Agreement were ambiguous, they could have offered parol evidence during the trial to clarify such provisions. They do not contend that they attempted to do so and that the district court wrongly excluded such evidence.

**2. Ambiguity as to when $5,000 deposit was due.** Lessees state that the Agreement is ambiguous as to when the security deposit was due. They are correct that the Agreement does not expressly state when the security deposit was due. But, as discussed above, the district court found that Lessees had failed to pay the security deposit when due, and that finding is supported by substantial and competent evidence.

**D. Is Any Party Entitled to an Award of Attorney Fees on Appeal?**

17

Lessees seek an award of attorney fees on appeal pursuant to Idaho Code §§ 12-120 and 12-121. Because those statutes only provide for the award of attorney fees to a prevailing party, Lessees are not entitled to an award of attorney fees. *Costa v. Borges*, 145 Idaho 353, 359, 179 P.3d 316, 322 (2008).

Lessor seeks an award of attorney fees on appeal pursuant to the terms of the Agreement and pursuant to Idaho Code § 12-120(3), which provides for the awarding of attorney fees in an action to recover on a guaranty and in a commercial transaction. The Agreement provides that in the event of default, Lessor could file a lawsuit and recover "all of our reasonable legal costs, including but not limited to reasonable attorneys' fees." Lessor has prevailed in this appeal and is entitled to an award of attorney fees under the Agreement and under section 12-120(3).

Seller seeks an award of attorney fees under Idaho Code §§ 12-120(3) and 12-121. Lessees alleged that Seller breached a contract (the Agreement) that was a commercial transaction and committed fraud in inducing Lessees to enter into that contract. Because Seller is the prevailing party, he is entitled to an award of attorney fees on appeal under section 12-120(3). *Farmers Nat'l Bank v. Shirey*, 126 Idaho 63, 73, 878 P.2d 762, 772 (1994) ("Where a party alleges the existence of a contractual relationship of a type embraced by section 12-120(3), . . . that claim triggers the application of the statute and a prevailing party may recover fees even though no liability under a contract was established."); *Blimka v. My Web Wholesaler, LLC*, 143 Idaho 723, 728-29, 152 P.3d 594, 599-600 (2007) (attorney fees are awardable under section 12-120(3) on a claim alleging that fraud induced the prevailing party to enter into a commercial transaction).

## IV. CONCLUSION

We affirm the judgments of the district court. We award respondents costs on appeal, including attorney fees.


Justices BURDICK, J. JONES, W. JONES and HORTON **CONCUR**.


18